*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KIMBERLY SKIPPER-BAINES, Personal
Representative of the ESTATE OF HENRY
HENDERSON,

      Plaintiff-Appellant,

v

BOARD OF HOSPITAL MANAGERS FOR THE
CITY OF FLINT, doing business as HURLEY
MEDICAL CENTER,

      Defendant-Appellee.

FOR PUBLICATION
August 22, 2024
9:20 a.m.

No. 365137
Genesee Circuit Court
LC No. 22-118065-NH

Before: MALDONADO, P.J., and M.J. KELLY and RICK, JJ.

MALDONADO, P.J.

Plaintiff, Kimberly Skipper-Baines, as personal representative of the Estate of Henry Henderson, appeals by delayed leave granted[1] the trial court's order granting summary disposition in favor of defendant pursuant to MCR 2.116(C)(7) (immunity). We reverse.

## I. BACKGROUND

In April 2020, the 91-year-old decedent was admitted to the Hurley Medical Center after being found unresponsive by his granddaughter. Defendant placed the decedent in a room that he shared with a mentally unstable roommate who had a known propensity for violent outbursts. Due to his violent proclivities, the roommate had a staff member assigned to be his "sitter" at all times. Testing revealed that the decedent was suffering from gallbladder disease, and he underwent a minor surgical procedure to temporarily treat the issue. Following the procedure, he was returned to the room that he shared with the roommate so that he could rest. The roommate, while walking

---

[1] *Estate of Henderson v Bd of Hosp Managers for the City of Flint*, unpublished order of the Court of Appeals, entered August 18, 2023 (Docket No. 365137) (Mappis Event 12).

to the bathroom, attacked the decedent with an IV pole. Hospital staff intervened but not before the roommate inflicted serious harm, and the decedent was left nonresponsive. Trauma surgeons on staff attempted to repair the decedent's injuries, but over the coming days, he continued to decline and ultimately died. The decedent contracted COVID-19 at some point after being admitted, and a forensic autopsy report provided that the cause of death was "COVID-19 associated pneumonia and complications thereof complicated by hypertensive and atherosclerotic cardiovascular disease."

Plaintiff, on behalf of the decedent's estate, brought claims for medical malpractice and ordinary negligence arising from the acts and omissions of defendant that made it possible for the decedent to be assaulted by his roommate. Generally, plaintiff asserted that the decedent should not have been placed in a room with a mentally unstable person known to be violent and that defendant's staff should have been better equipped to intervene in the event of a violent outburst. Plaintiff asserted that the assault was, at minimum, an important factor in bringing about the decedent's death. Defendant moved for summary disposition, arguing that a statute enacted and executive order issued in response to the pandemic immunized it from any liability. The trial court agreed and thus granted summary disposition pursuant to MCR 2.116(C)(7).

This appeal followed.

## II. DISCUSSION

Plaintiff argues that the trial court erred by deeming defendant immune from litigation because plaintiff's claims do not arise from services that defendant provided in support of the state's response to the pandemic. We agree.

"This Court reviews de novo a trial court's decision on a motion for summary disposition, as well as questions of statutory interpretation and the construction and application of court rules." *Dextrom v Wexford Co*, 287 Mich App 406, 416; 789 NW2d 211 (2010). A motion is properly granted pursuant to MCR 2.116(C)(7) when "[e]ntry of judgment, dismissal of the action, or other relief is appropriate because of . . . immunity granted by law . . . ."

> The moving party may support its motion for summary disposition under MCR 2.116(C)(7) with affidavits, depositions, admissions, or other documentary evidence, the substance of which would be admissible at trial. The contents of the complaint are accepted as true unless contradicted by the evidence provided. [*Latits*, 298 Mich App at 113 (quotation marks and citation omitted).]

"All matters of statutory interpretation begin with an examination of the language of the statute." *McQueer v Perfect Fence Co*, 502 Mich 276, 286; 917 NW2d 584 (2018). If a statute is unambiguous, it "must be applied as written." *Id*. (quotation marks and citation omitted). This Court may not read something into the statute "that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Id*. (quotation marks and citation omitted). Furthermore, statutory language "cannot be viewed in isolation, but must be construed in accordance with the surrounding text and the statutory scheme." *Id*. (quotation marks and citation omitted). "Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *State Farm*

*Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002). Courts "give undefined statutory terms their plain and ordinary meanings." *Id*. Executive orders are generally subject to the same rules of interpretation as statutes.

Decisive in this case is section 5 of the Pandemic Health Care Immunity Act, MCL 691.1471 *et seq*., which provides:

> A health care provider or health care facility that provides health care services in support of this state's response to the COVID-19 pandemic is not liable for an injury, including death, sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility. [MCL 691.1475.]

Similarly, Executive Order No. 2020-30, which has been rescinded but was effective at all relevant times, provided in relevant part:

> [A]ny licensed health care professional or designated health care facility that provides medical services in support of this state's response to the COVID-19 pandemic is not liable for an injury sustained by a person by reason of those services, regardless of how or under what circumstances or by what cause those injuries are sustained, unless it is established that such injury or death was caused by the gross negligence . . . of such health care professional or designated health care facility.

The services that allegedly caused the injury in this case were not given "in support of this state's response to the" pandemic. This lawsuit stems entirely from the beating inflicted upon the decedent by his roommate. The record suggests that the decedent did not contract COVID-19 until after he was hospitalized due to an unrelated illness, and at the time of the attack, he was recovering from a gallbladder procedure. The roommate was likewise not being treated for COVID-19, and there is no suggestion that COVID-19 in some way spurred the attack. The alleged negligent act was placing him in a room with an unsafe roommate, and the alleged omission was failing to deploy adequate safeguards to protect the decedent from the roommate whom was known to be unsafe. It is clear to us that neither of those were done in support of the pandemic response. There certainly will be gray area with respect to whether medical services were offered in support of the state's pandemic response, but this particular case is black and white. The alleged acts, omissions, and injuries were wholly unrelated to the pandemic, so deeming defendant immune would contravene the Legislature's clearly-communicated intent to limit this immunization to services stemming from the pandemic. The fact that the decedent apparently contracted COVID-19 at some point following his admission does not change the fact that he was not being treated at the hospital for COVID-19 or that the incident giving rise to this litigation was completely separate.

The trial court said, "[T]hat [the decedent] was not treated there initially for COVID-19 and in fact his injuries that led to his death were not COVID-19 related is of little import with regard to the interpretation of the statute." This statement directly contravenes the statute's plain

language. If this interpretation were adopted, it is difficult to imagine any scenario in which a medical malpractice suit arising from acts and omissions occurring during the COVID-19 emergency could proceed. The Legislature and the Governor would not have limited the immunity conferred pursuant to this statute to services supporting the pandemic response if it actually intended for all medical providers to be immune from all liability short of gross negligence. The court is correct that the statute and executive order do not state that "the patient has to be a COVID-19 patient or that the treatment has to be related specifically to COVID-19," but these authorities do limit the immunity to services offered in response to COVID-19. The trial court's interpretation would render the limiting language nugatory, which we are not permitted to do. *State Farm*, 466 Mich at 146.

We do not hold that immunity only applies when a patient is being treated for COVID-19, but it is clear that there must be some connection. For example, if an unrelated emergency was not timely dealt with because hospital staff were overwhelmed with COVID-19 patients, there might be immunity. If a hospital ran out of ventilators, there might be immunity for cases involving patients who needed ventilators for unrelated ailments. However, in this case, there was absolutely no connection between the alleged malpractice and the pandemic. Therefore, there is no immunity. Defendant notes that the decedent could not be transferred to the University of Michigan for an eye surgery following the attack because the pandemic left this facility overcrowded. However, the claims of negligence and malpractice arise from the acts and omissions leading to the attack, not from alleged shortcomings in treatment. Defendants further argue that "any claim of improper treatment for COVID-19 to prevent the patient's death would be covered" by the immunity, but this is not plaintiff's claim. Whether COVID-19 was the true cause of death is a question of fact, and even if COVID-19 was the ultimate cause of death, defendant could still be liable for any damages arising specifically from the assault.

Our holding today is consistent with this Court's recent holding in *Warran v McLaren Flint*, ___ Mich App ___; ___ NW3d ___ (2024) (Docket No. 366266). In that case, this Court held that the statute and EO were not limited to care specifically treating COVID-19, but it did not hold that all hospitals that treated COVID-19 were immune from all malpractice actions not premised on gross negligence. *Id*. at ___; slip op at 9. In that case, the plaintiff's claim arose from pressure ulcers that he developed while being treated by the defendant for COVID-19, and "[h]e alleged that during that time he developed additional pressure ulcers and minimal nursing intervention occurred to treat and prevent the formation of those pressure ulcers. *Id*. at ___, ___; slip op at 2, 9. This Court explained:

> Plaintiff alleged that he developed multiple pressure ulcers in defendant's care. Those injuries were a consequence of the care defendant provided in response to COVID-19. Stated otherwise, those injuries were sustained by reason of the healthcare services provided by defendant in support of the state's response to the COVID-19 pandemic. Plaintiff presented at the hospital with signs of COVID-19, was admitted to the COVID-19 floor for COVID-19 treatment, and allegedly developed pressure ulcers as a result of that care. Such a sequence of events is covered by the plain language of the statute. [*Id*. at ___; slip op at 9-10.]

Consistent with our discussion above, this Court held in *Warren* that the statute and EO conferred broad immunity that reached far beyond the direct treatment of COVID-19. Indeed, as noted in

-4-

*Warren*, this immunity could even stretch to cover injuries arising from the redirection of "hospital resources to fighting the COVID-19 pandemic . . . ." *Id*. at ___; slip op at 8. However, this Court did *not* accept plaintiff's invitation to render nugatory any of the statutory language. In the present case, there is simply no connection between the pandemic and the alleged negligence/malpractice. In *Warren*, this Court reached a different outcome because, unlike this case, there was a clear connection between the pandemic and the services giving rise to the cause of action. Therefore, there was immunity in *Warren* but there is no immunity here.

## III. CONCLUSION

The trial court's order granting summary disposition in favor of defendant is reversed. This case is remanded for additional proceedings consistent with this opinion. Because this conclusion resolves the appeal, we need not address plaintiffs' alternative bases for reversal. We do not retain jurisdiction. Plaintiff, being the prevailing party, may tax costs. MCR 7.219(A).

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Kelly
/s/ Michelle M. Rick